# EXHIBIT 1

## SECURITIES EXCHANGE AGREEMENT

SECURITIES EXCHANGE AGREEMENT (the "**Agreement**"), dated as of April 30, 2007, by and among Charys Holding Company, Inc. (the "**Company**") and the investors listed on the Schedule of Investors attached hereto (individually, a "**Investor**" and collectively, the "**Investors**").

### WHEREAS:

A. The Company and each Investor is executing and delivering this Agreement in reliance upon the exemption from securities registration afforded by Section 4(2) of the Securities Act of 1933, as amended (the "**1933 Act**"), and Rule 506 of Regulation D ("**Regulation D**") as promulgated by the United States Securities and Exchange Commission (the "**SEC**") under the 1933 Act.

B. In exchange for refinancing the shares of Series D Cumulative Preferred Stock in the Company set forth opposite such Investor's name in column (4) on the Schedule of Investors, the Company has authorized the issuance of subordinated unsecured convertible notes of the Company in substantially the form attached hereto as Exhibit A (together with any convertible notes issued in replacement thereof in accordance with the terms thereof, the "**Notes**"), which Notes shall be convertible into the Company's common stock, par value $0.001 per share (the "**Common Stock**"), in accordance with the terms of the Notes.

C. Each Investor wishes to exchange and the Company wishes to exchange, upon the terms and conditions stated in this Agreement, that aggregate principal amount of Notes set forth opposite such Investor's name in column (3) on the Schedule of Investors (which aggregate principal amount for all Investors shall be $15,037,278 and the shares of Common Stock into which such Notes are convertible being referred to herein as the "**Conversion Shares**"), in exchange for such number of Series D Cumulative Preferred Stock in the Company as is set forth opposite such Buyer's name in column (4) on the Schedule of Investors.

D. The Company and Buyer intend that the aforementioned exchange shall be in accordance with the requirements of Rule 144(d)(3) of the 1933 Act such that the Notes shall be deemed to have been acquired at the same time as the Series D Cumulative Preferred Stock in the Company surrendered in connection with the exchange.

E. In the event of certain defaults with respect to payments under the Notes, the Company shall issue warrants in substantially the form attached hereto as Exhibit B (the "**Default Warrants**"), to acquire that number of shares of Common Stock as provided in the Notes (the "**Default Warrant Shares**").

F. Contemporaneously with the execution and delivery of this Agreement, the parties hereto are executing and delivering a Registration Rights Agreement, substantially in the form attached hereto as Exhibit C (the "**Registration Rights Agreement**"), pursuant to which the Company has agreed to provide certain registration rights with respect to the Registrable Securities (as defined in the Registration Rights Agreement), under the 1933 Act and the rules and regulations promulgated thereunder, and applicable state securities laws.

G. At the Closing, that certain Escrow Shares Escrow Agreement pursuant to which the Company issued and delivered to Gottbetter & Partners, LLP 8,666,666 shares of Common Stock as "security stock" shall be terminated.

H. Those certain warrants issued to the Investors on May 19, 2006 shall continue to be outstanding following the Closing.

I. The Notes, the Conversion Shares, the Default Warrants and the Default Warrant Shares are collectively referred to herein as the "**Securities**."

NOW, THEREFORE, the Company and each Investor hereby agree as follows:

1. **PURCHASE AND SALE OF NOTES.**

    (a) <u>Amount</u>. Subject to the satisfaction (or waiver) of the conditions set forth in Sections 6 and 7 below, the Company shall issue to each Investor, and each Investor severally, but not jointly, agrees to exchange with the Company on the Closing Date (as defined below), a principal amount of Notes, as is set forth opposite such Investor's name in column (3) on the Schedule of Investors.

    (b) <u>Closing</u>. The closing (the "**Closing**") of the purchase of the Notes by the Investors shall occur at the offices of McDermott, Will & Emery LLP, 340 Madison Avenue, New York, New York 10173. The date and time of the Closing (the "**Closing Date**") shall be 10:00 a.m., New York City time, on the date hereof, subject to the notification of satisfaction (or waiver) of the conditions to the Closing set forth in Sections 6 and 7 below (or such later date as is mutually agreed to by the Company and each Investor). As used herein "Business Day" means any day other than a Saturday, Sunday or other day on which commercial banks in The City of New York are authorized or required by law to remain closed.

    (c) <u>Exchange Consideration</u>. The aggregate exchange consideration for the Notes to be received by each Investor (the "**Exchange Consideration**") shall be the number of shares of Series D Cumulative Preferred Stock in the Company set forth opposite such Investor's name in column (4) on the Schedule of Investors.

    (d) <u>Exchange of Shares</u>. On the Closing Date, (A) each Investor shall deliver its portion of the Exchange Consideration to the Company for the Notes to be issued to such Investor at the Closing, by delivery of certificates representing such number of Series D Cumulative Preferred Stock in the Company as is set forth opposite such Investor's name in column (4) on the Schedule of Investors (the "**Series D Cumulative Preferred Certificates**"), duly endorsed (or accompanied by duly executed stock powers) for transfer to the Company and (B) the Company shall deliver to each Investor the Notes (in the principal amounts as is set forth opposite such Investor's name in column (3) on the Schedule of Investors), each duly executed on behalf of the Company and registered in the name of such Investor or its designee.

2. **REPRESENTATIONS AND WARRANTIES.**

    Each Investor represents and warrants with respect to only itself that:

    (a) <u>Organization; Authority</u>. Such Investor is an entity duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization with the requisite power and authority to enter into and to consummate the transactions contemplated by the Transaction Documents (as defined below) to which it is a party and otherwise to carry out its obligations hereunder and thereunder.

    (b) <u>No Public Sale or Distribution</u>. Such Investor is (i) acquiring the Notes and, if applicable, the Default Warrants, (ii) upon conversion of the Notes will acquire the Conversion Shares, and (iii), if applicable, upon exercise of the Default Warrants will acquire the Default Warrant Shares, in each case, for its own account and not with a view towards, or for resale in connection with, the public sale or distribution thereof, except pursuant to sales registered or exempted under the 1933 Act; *provided, however,* that by making the representations herein, such Investor does not agree to hold any of the Securities for any minimum or other specific term and reserves the right to dispose of the Securities at any time in accordance with or pursuant to a registration statement or an exemption under the 1933 Act. Such Investor is not a broker-dealer registered, or required to be registered, with the SEC under the 1934 Act. Such Investor is acquiring the Securities hereunder in the ordinary course of its business. Such Investor does not presently have any agreement or understanding, directly or indirectly, with any Person to distribute any of the Securities.

    (c) <u>Accredited Investor Status</u>. Such Investor is an "accredited investor" as that term is defined in Rule 501(a) of Regulation D.

    (d) <u>Reliance on Exemptions</u>. Such Investor understands that the Securities are being offered and sold to it in reliance on specific exemptions from the registration requirements of United States federal and state securities laws and that the Company is relying in part upon the truth and accuracy of, and such Investor's compliance with,

the representations, warranties, agreements, acknowledgments and understandings of such Investor set forth herein in order to determine the availability of such exemptions and the eligibility of such Investor to acquire the Securities.

(e) <u>Information</u>. Such Investor and its advisors, if any, have been furnished with all materials relating to the business, finances and operations of the Company and materials relating to the transactions contemplated hereby which have been requested by such Investor. Such Investor and its advisors, if any, have been afforded the opportunity to ask questions of the Company. Neither such inquiries nor any other due diligence investigations conducted by such Investor or its advisors, if any, or its representatives shall modify, amend or affect such Investor's right to rely on the Company's representations and warranties contained herein. Such Investor understands that its investment in the Securities involves a high degree of risk. Such Investor has sought such accounting, legal and tax advice as it has considered necessary to make an informed investment decision with respect to its investment in the Securities. Specifically, such Investor has been provided with access to all of the Company's SEC Documents (as defined below), including the following: (i) the Company's annual report to stockholders for the fiscal year ended April 30, 2006, and the definitive proxy statement filed in connection with that annual report; (ii) the information contained in an annual report on Form 10-KSB under the 1934 Act for the fiscal year ended April 30, 2006; and (iii) the information contained in any reports or documents required to be filed by the Company under Sections 13(a), 14(a), 14(c), and 15(d) of the 1934 Act since the distribution or filing of the reports specified above. As used herein, "SEC Documents" means all reports, schedules, exhibits, forms, statements and other documents required to be filed by the Company with the SEC pursuant to the reporting requirements of the 1934 Act (including documents incorporated by reference therein), including the registration statement filed by the Company on Form SB-2 on April 30, 2007 and any other registration statements filed by the Company pursuant to the 1933 Act.

(f) <u>No Governmental Review</u>. Such Investor understands that no United States federal or state agency or any other government or governmental agency has passed on or made any recommendation or endorsement of the Securities or the fairness or suitability of the investment in the Securities nor have such authorities passed upon or endorsed the merits of the offering of the Securities.

(g) <u>Transfer or Resale</u>. Such Investor understands that except as provided in the Registration Rights Agreement: (i) the Securities have not been and are not being registered under the 1933 Act or any state securities laws, and may not be offered for sale, sold, assigned or transferred unless (A) subsequently registered thereunder, (B) such Investor shall have delivered to the Company an opinion of counsel, in a generally acceptable form, to the effect that such Securities to be sold, assigned or transferred may be sold, assigned or transferred pursuant to an exemption from such registration, or (C) such Investor provides the Company with reasonable assurance that such Securities can be sold, assigned or transferred pursuant to Rule 144 or Rule 144A promulgated under the 1933 Act, as amended (or a successor rule thereto) (collectively, "**Rule 144**"); (ii) any sale of the Securities made in reliance on Rule 144 may be made only in accordance with the terms of Rule 144 and further, if Rule 144 is not applicable, any resale of the Securities under circumstances in which the seller (or the Person (as defined in Section 3(s)) through whom the sale is made) may be deemed to be an underwriter (as that term is defined in the 1933 Act) may require compliance with some other exemption under the 1933 Act or the rules and regulations of the SEC thereunder; and (iii) neither the Company nor any other Person is under any obligation to register the Securities under the 1933 Act or any state securities laws or to comply with the terms and conditions of any exemption thereunder. The Securities may be pledged in connection with a bona fide margin account or other loan or financing arrangement secured by the Securities and such pledge of Securities shall not be deemed to be a transfer, sale or assignment of the Securities hereunder, and no Investor effecting a pledge of Securities shall be required to provide the Company with any notice thereof or otherwise make any delivery to the Company pursuant to this Agreement or any other Transaction Document (as defined in Section 3(b)), including, without limitation, this Section 2(g).

(h) <u>Legends</u>. Such Investor understands that the certificates or other instruments representing the Notes and, if applicable, the Default Warrants and, until such time as the resale of the Conversion Shares and the Default Warrant Shares have been registered under the 1933 Act as contemplated by the Registration Rights Agreement, the stock certificates representing the Conversion Shares and the Default Warrant Shares, except as set forth below, shall bear any legend as required by the "blue sky" laws of any state and a restrictive legend in substantially the following form (and a stop-transfer order may be placed against transfer of such stock certificates):

[NEITHER THE ISSUANCE AND SALE OF THE SECURITIES REPRESENTED BY THIS CERTIFICATE NOR THE SECURITIES INTO WHICH THESE SECURITIES ARE [CONVERTIBLE]

[EXERCISABLE] HAVE BEEN][THE SECURITIES REPRESENTED BY THIS CERTIFICATE HAVE NOT BEEN] REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR APPLICABLE STATE SECURITIES LAWS. THE SECURITIES MAY NOT BE OFFERED FOR SALE, SOLD, TRANSFERRED OR ASSIGNED (I) IN THE ABSENCE OF (A) AN EFFECTIVE REGISTRATION STATEMENT FOR THE SECURITIES UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR (B) AN OPINION OF COUNSEL, IN A GENERALLY ACCEPTABLE FORM, THAT REGISTRATION IS NOT REQUIRED UNDER SAID ACT OR (II) UNLESS SOLD PURSUANT TO RULE 144 OR 144A UNDER SAID ACT. NOTWITHSTANDING THE FOREGOING, THE SECURITIES MAY BE PLEDGED IN CONNECTION WITH A BONA FIDE MARGIN ACCOUNT OR OTHER LOAN OR FINANCING ARRANGEMENT SECURED BY THE SECURITIES.

The legend set forth above shall be removed and the Company shall issue a certificate without such legend to the holder of the Securities upon which it is stamped, if, unless otherwise required by state securities laws, (i) such Securities are registered for resale under the 1933 Act, (ii) in connection with a sale, assignment or other transfer, such holder provides the Company with an opinion of counsel, in a generally acceptable form, to the effect that such sale, assignment or transfer of the Securities may be made without registration under the applicable requirements of the 1933 Act, or (iii) such holder provides the Company with reasonable assurance that the Securities can be sold, assigned or transferred pursuant to Rule 144 or Rule 144A. The Company shall bear all fees and expenses related to the removal of the legend and issuance of any new unlegended Securities.

(i) <u>Validity; Enforcement</u>. This Agreement and the Registration Rights Agreement have been duly and validly authorized, executed and delivered on behalf of such Investor and shall constitute the legal, valid and binding obligations of such Investor enforceable against such Investor in accordance with their respective terms, except as such enforceability may be limited by general principles of equity or applicable bankruptcy, insolvency, reorganization, moratorium, liquidation and other similar laws relating to, or affecting generally, the enforcement of applicable creditors' rights and remedies.

(j) <u>No Conflicts</u>. The execution, delivery and performance by such Investor of this Agreement and the Registration Rights Agreement and the consummation by such Investor of the transactions contemplated hereby and thereby will not (i) result in a violation of the organizational documents of such Investor or (ii) conflict with, or constitute a default (or an event which with notice or lapse of time or both would become a default under, or give to others any rights of termination, amendment, acceleration or cancellation of, any agreement, indenture or instrument to which such Investor is a party), (iii) result in a violation of any law, rule, regulation, order, judgment or decree (including federal and state securities laws) applicable to such Investor, except in the case of clauses (ii) and (iii) above, for such conflicts, defaults, rights or violations which would not, individually or in the aggregate, reasonably be expected to have a material adverse effect on the ability of such Investor to perform its obligations hereunder.

(k) <u>Residency</u>. Such Investor is a resident of that jurisdiction specified below its address on the Schedule of Investors.

(l) <u>General Solicitation</u>. No Investor is purchasing the Securities as a result of any advertisement, article, notice or other communication regarding the Securities published in any newspaper, magazine or similar media or broadcast over television or radio or presented at any seminar.

3. **REPRESENTATIONS AND WARRANTIES OF THE COMPANY.**

The Company represents and warrants to each of the Investors that, except as otherwise set forth in the SEC Documents or otherwise on the schedule of exceptions delivered to the Investors in connection with the execution of this Agreement (the "**Schedules**"):

(a) <u>Organization and Qualification</u>. The Company and its "Subsidiaries" (which for purposes of this Agreement means any joint venture or any entity in which the Company, directly or indirectly, owns capital stock or holds an equity or similar interest) are entities duly organized and validly existing in good standing under the laws of the jurisdiction in which they are formed, and have the requisite power and authority to own their properties and to carry on their business as now being conducted. Each of the Company and its Subsidiaries is duly qualified as a foreign entity to do business and is in good standing in every jurisdiction in which its ownership of property or the nature of the business conducted by it makes such qualification necessary, except to the extent that the failure to be

so qualified or be in good standing would not have a Material Adverse Effect. As used in this Agreement, "**Material Adverse Effect**" means any material adverse effect on the business, properties, assets, operations, results of operations, condition (financial or otherwise) or prospects of the Company and its Subsidiaries, both taken as a whole and individually as to any Subsidiary that is a Significant Subsidiary (as defined in Regulation S-X), or on the transactions contemplated hereby and the other Transaction Documents or by the agreements and instruments to be entered into in connection herewith or therewith, or on the authority or ability of the Company to perform its obligations under the Transaction Documents (as defined below). The Company has no Subsidiaries except as set forth on Schedule 3(a). The Company owns, directly or indirectly, all of the capital stock or other equity interests of each Subsidiary free and clear of any liens, except for Permitted Liens (as defined in the Notes), and all the issued and outstanding shares of capital stock of each Subsidiary are validly issued and are fully paid, non-assessable and free of preemptive and similar rights to subscribe for or purchase securities. For purposes of this Agreement, "Lien" means, with respect to any property, any mortgage, pledge, hypothecation, assignment, security interest, tax lien, charge, or other lien, easement or encumbrance.

(b) <u>Authorization; Enforcement; Validity</u>.  The Company has the requisite corporate power and authority to enter into and perform its obligations under this Agreement, if applicable, the Default Warrants, the Registration Rights Agreement and each of the other agreements entered into by the parties hereto in connection with the transactions contemplated by this Agreement (collectively, the "**Transaction Documents**") and to issue the Securities in accordance with the terms hereof and thereof. The execution and delivery of this Agreement and the other Transaction Documents by the Company and the consummation by the Company of the transactions contemplated hereby and thereby, including, without limitation, the issuance of the Notes and the reservation for issuance and the issuance of the Conversion Shares issuable upon conversion of the Notes, the issuance of the Default Warrants and the reservation for issuance and issuance of the Default Warrant Shares issuable upon exercise of the Default Warrants, have been duly authorized by the Company's Board of Directors and (other than the filing with the SEC of one or more Registration Statements in accordance with the requirements of the Registration Rights Agreement and any other filings as may be required by any state securities agencies) no further filing, consent, or authorization is required by the Company, its Board of Directors or its stockholders. This Agreement and the other Transaction Documents of even date herewith have been duly executed and delivered by the Company, and constitute the legal, valid and binding obligations of the Company, enforceable against the Company in accordance with their respective terms, except as such enforceability may be limited by general principles of equity or applicable bankruptcy, insolvency, reorganization, moratorium, liquidation or similar laws relating to, or affecting generally, the enforcement of applicable creditors' rights and remedies and except as rights to indemnification and to contribution may be limited by federal or state securities law.

(c) <u>Issuance of Securities</u>.  The issuance of the Notes and, if applicable, the Default Warrants are duly authorized and upon issuance in accordance with the terms of the Transaction Documents shall be free from all taxes, liens and charges with respect to the issue thereof. As of the Closing, the Company shall have reserved from its duly authorized capital stock not less than 130% of the sum of the maximum number of shares of Common Stock issuable upon conversion of the Notes (without taking into account any limitations on the conversion of the Notes set forth in the Notes. Upon issuance or conversion in accordance with the Notes or exercise in accordance with the Default Warrants, as the case may be, the Conversion Shares and the Default Warrant Shares, respectively, will be validly issued, fully paid and nonassessable and free from all preemptive or similar rights, taxes, liens and charges with respect to the issue thereof, with the holders being entitled to all rights accorded to a holder of Common Stock. Subject to the representations and warranties of the Investors in this Agreement, the offer and issuance by the Company of the Securities is exempt from registration under the 1933 Act.

(d) <u>No Conflicts</u>.  The execution, delivery and performance of this Agreement and the other Transaction Documents by the Company and the consummation by the Company of the transactions contemplated hereby and thereby (including, without limitation, the issuance of the Notes, if applicable, the Default Warrants, and reservation for issuance of the Conversion Shares and the Default Warrant Shares) will not (i) result in a violation of the Certificate of Incorporation (as defined in Section 3(r)) of the Company or Bylaws (as defined in Section 3(r)) of the Company or (ii) conflict with, or constitute a default (or an event which with notice or lapse of time or both would become a default) under, or give to others any rights of termination, amendment, acceleration or cancellation of, any agreement, indenture or instrument to which the Company or any of its Subsidiaries is a party, except to the extent such conflict, default or termination right would not reasonably be expected to have a Material Adverse Effect, or (iii) result in a violation of any law, rule, regulation, order, judgment or decree (including federal and state securities

NYK 1100123-1.075266.0020

laws and regulations and the rules and regulations of the Over-The-Counter Bulletin Board of the NASD (the "Principal Market") applicable to the Company or any of its Subsidiaries or by which any property or asset of the Company or any of its Subsidiaries is bound or affected except, in the case of clause (ii) or (iii) above, to the extent such violations would not reasonably be expected to have a Material Adverse Effect.

(e) <u>Consents</u>. The Company is not required to obtain any consent, authorization or order of, or make any filing or registration with, any court, governmental agency or any regulatory or self-regulatory agency or any other Person in order for it to execute, deliver or perform any of its obligations under or contemplated by this Agreement and the other Transaction Documents, in each case in accordance with the terms hereof or thereof. All consents, authorizations, orders, filings and registrations which the Company is required to obtain pursuant to the preceding sentence have been obtained or effected on or prior to the Closing Date or as may be otherwise permitted hereunder, and the Company is unaware of any facts or circumstances which might prevent the Company from obtaining or effecting any of the registration, application or filings pursuant to the preceding sentence.

(f) <u>Acknowledgment Regarding Investors' Purchase of Securities</u>. The Company acknowledges and agrees that each Investor is acting solely in the capacity of an arm's-length purchaser with respect to this Agreement and the other Transaction Documents and the transactions contemplated hereby and thereby and that no Investor is (i) an officer or director of the Company, (ii) an "affiliate" of the Company or any of its Subsidiaries (as defined in Rule 144) or (iii) to its knowledge, a "beneficial owner" of more than 10% of the shares of Common Stock (as defined for purposes of Rule 13d-3 of the Securities Exchange Act of 1934, as amended (the "1934 Act")). The Company further acknowledges that no Investor is acting as a financial advisor or fiduciary of the Company or any of its Subsidiaries (or in any similar capacity) with respect to the Transaction Documents and the transactions contemplated hereby and thereby, and any advice given by a Investor or any of its representatives or agents in connection with this Agreement and the other Transaction Documents and the transactions contemplated hereby and thereby is merely incidental to such Investor's purchase of the Securities. The Company further represents to each Investor that the Company's decision to enter into this Agreement and the other Transaction Documents has been based solely on the independent evaluation by the Company and its representatives.

(g) <u>No General Solicitation; Placement Agent's Fees</u>. Neither the Company, nor any of its Subsidiaries or affiliates, nor any Person acting on its or their behalf, has engaged in any form of general solicitation or general advertising (within the meaning of Regulation D) in connection with the offer or sale of the Securities. The Company shall be responsible for the payment of any placement agent's fees, financial advisory fees, or brokers' commissions (other than for persons engaged by any Investor or its investment advisor) relating to or arising out of the transactions contemplated hereby. The Company shall pay, and hold each Investor harmless against, any liability, loss or expense (including, without limitation, attorneys' fees and out-of-pocket expenses) arising in connection with any such claim. The Company acknowledges that it has engaged Gottbetter Capital Finance, LLC to structure the transaction in connection with the exchange of the Securities. The Company has not engaged any placement agent or other agent in connection with the exchange of the Securities.

(h) <u>No Integrated Offering</u>. None of the Company, its Subsidiaries, any of their affiliates, or any Person acting on its or their behalf has, directly or indirectly, made any offers or sales of any security or solicited any offers to buy any security, under circumstances that would require registration of any of the Securities under the 1933 Act or cause this offering of the Securities to be integrated with prior offerings by the Company for purposes of the 1933 Act or any applicable stockholder approval provisions, including, without limitation, under the rules and regulations of any exchange or automated quotation system on which any of the securities of the Company are listed or designated. None of the Company, its Subsidiaries, their affiliates or any Person acting on its or their behalf will take any action or steps referred to in the preceding sentence that would require registration of any of the Securities under the 1933 Act or cause the offering of the Securities to be integrated with other offerings.

(i) <u>Dilutive Effect</u>. The Company understands and acknowledges that the number of Conversion Shares and/or Default Warrant Shares issuable upon exercise of the Notes and/or Default Warrants, as applicable, will increase in certain circumstances. The Company further acknowledges that its obligation to issue Conversion Shares upon conversion of the Notes in accordance with this Agreement and its obligation to issue the Default Warrant Shares upon exercise of the Default Warrants in accordance with the Notes and the Default Warrants is, in each case, absolute and unconditional regardless of the dilutive effect that such issuance may have on the ownership interests of other stockholders of the Company.

NYK 1100123-1.075266.0020

(j) **Application of Takeover Protections; Rights Agreement**. The Company and its board of directors have taken all necessary action, if any, in order to render inapplicable any control share acquisition, business combination, poison pill (including any distribution under a rights agreement) or other similar anti-takeover provision under the Certificate of Incorporation or the laws of the jurisdiction of its incorporation which is or could become applicable to any Investor as a result of the transactions contemplated by this Agreement, including, without limitation, the Company's issuance of the Securities and any Investor's ownership of the Securities. The Company has not adopted a stockholder rights plan or similar arrangement relating to accumulations of beneficial ownership of Common Stock or a change in control of the Company.

(k) **SEC Documents; Financial Statements**. Except as disclosed in the SEC Documents or on Schedule 3(k), during the two (2) years prior to the date hereof, the Company has filed all SEC Documents required to be filed by it with the SEC. The Company has delivered to the Investors or their respective representatives true, correct and complete copies of each of the SEC Documents not available on the EDGAR system that have been requested by each Investor. As of their respective dates, the SEC Documents complied in all material respects with the requirements of the 1934 Act and the rules and regulations of the SEC promulgated thereunder applicable to the SEC Documents, and none of the SEC Documents, at the time they were filed with the SEC, contained any untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary in order to make the statements therein, in the light of the circumstances under which they were made, not misleading. The financial statements of the Company included in the SEC Documents complied as to form in all material respects with applicable accounting requirements and the published rules and regulations of the SEC with respect thereto as in effect as of the time of filing. Such financial statements have been prepared in accordance with generally accepted accounting principles, consistently applied, during the periods involved (except (i) as may be otherwise indicated in such financial statements or the notes thereto, or (ii) in the case of unaudited interim statements, to the extent they may exclude footnotes or may be condensed or summary statements) and fairly present in all material respects the financial position of the Company as of the dates thereof and the results of its operations and cash flows for the periods then ended (subject, in the case of unaudited statements, to normal year-end audit adjustments). No other information provided by or on behalf of the Company to the Investors which is not included in the SEC Documents, including, without limitation, information referred to in Section 2(e) of this Agreement, contains any untrue statement of a material fact or omits to state any material fact necessary in order to make the statements therein not misleading, in the light of the circumstance under which they are or were made.

(l) **Absence of Certain Changes**. Except as disclosed in the SEC Documents filed at least three Business Days prior to the date of this Agreement, since the date of the Company's most recent audited financial statements contained in a Form 10-KSB, there has been no material adverse change and no material adverse development in the business, assets, properties, operations, condition (financial or otherwise), results of operations or prospects of the Company or its Subsidiaries. Since the date of the Company's most recent audited financial statements contained in a Form 10-KSB, neither the Company nor any of its Subsidiaries has (i) declared or paid any dividends, (ii) sold any assets, individually or in the aggregate, in excess of $500,000 outside of the ordinary course of business or (iii) had capital expenditures, individually or in the aggregate, in excess of $500,000. Neither the Company nor any of its Subsidiaries has taken any steps to seek protection pursuant to any bankruptcy law nor does the Company have any knowledge or reason to believe that its creditors intend to initiate involuntary bankruptcy proceedings or any actual knowledge of any fact which would reasonably lead a creditor to do so. The Company, individually and on a consolidated basis, is not as of the date hereof, and after giving effect to the transactions contemplated hereby to occur at the Closing, will not be Insolvent (as defined below). For purposes of this Section 3(l), "Insolvent" means (i) the present fair saleable value of the Company's and its Subsidiaries' assets is less than the amount required to pay the Company's and its Subsidiaries' total Indebtedness (as defined in Section 3(s)), (ii) the Company and its Subsidiaries are unable to pay their debts and liabilities, subordinated, contingent or otherwise, as such debts and liabilities become absolute and matured or (iii) the Company and its Subsidiaries intend to incur or believe that they will incur debts that would be beyond their ability to pay as such debts mature or (iv) the Company has unreasonably small capital with which to conduct the business in which it is engaged as such business is now conducted and is proposed to be conducted.

(m) **No Undisclosed Events, Liabilities, Developments or Circumstances**. No event, liability, development or circumstance has occurred or exists, or is contemplated to occur with respect to the Company, its Subsidiaries or their respective business, properties, prospects, operations or financial condition, that would be required to be disclosed by the Company under applicable securities laws on a registration statement on Form S-1 or

NYK 1100123-1.075266.0020